# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 11
Lilya Andryeyeva, &c., et al.,
     Respondents,
    v.
New York Health Care, Inc.,
d/b/a New York Home Attendant Agency,
et al.,
     Appellants.
----------------------------------------------------
No. 12
Adriana Moreno, &c., et al.,
     Respondents,
    v.
Future Care Health Services, Inc., et al.,
     Appellants.

Case No. 11:
Sari E. Kolatch, for appellants.
Jason J. Rozger, for respondents.
Home Care Association of New York State, Inc. et al.; Consumer Directed Personal Assistance Association of New York State, Inc.; Home Care Association of America et al.; Greater New York Hospital Association, et al.; Sanford Heisler Sharp, LLP; Community Development Project, et al.; New York State Association of Health Care Providers, Inc.; New York State Department of Labor; National Center for Law and Economic Justice, amici curiae.

Case No. 12:
Aaron C. Schlesinger, for appellants.
Michael J. D. Sweeney, for respondents.
Sanford Heisler Sharp, LLP; Greater New York Hospital Association, et al.; Community Development Project, et al.; New York State Department of Labor, amici curiae.

RIVERA, J.:

The common issue presented in these joint appeals is whether, pursuant to the New York State Department of Labor's (DOL) Miscellaneous Industries and Occupations Minimum Wage Order (Wage Order), an employer must pay its home health care aide

employees for each hour of a 24-hour shift. DOL has interpreted its Wage Order to require payment for at least 13 hours of a 24-hour shift if the employee is allowed a sleep break of at least 8 hours—and actually receives five hours of uninterrupted sleep—and three hours of meal break time. DOL's interpretation of its Wage Order does not conflict with the promulgated language, nor has DOL adopted an irrational or unreasonable construction, and so the Appellate Division erred in rejecting that interpretation. Therefore, we reverse the Appellate Division orders and remit for consideration of alternative grounds for class certification for alleged violations of New York's Labor Law, inclusive of defendants' alleged systematic denial of wages earned and due, unaddressed by the courts below because of their erroneous rejection of DOL's interpretation.

I.

Statutory and regulatory background

New York's Labor Law requires that all employees be paid a minimum wage for each hour worked (Labor Law § 652). The Legislature passed the Minimum Wage Act (the "Act") in 1937 to ensure that workers "receive wages sufficient to provide adequate maintenance and to protect their health" (L 1937, ch 276, § 551). In 1971, the Legislature extended the Act to cover home health care aides living outside the employer's home (L 1971, ch 1165, § 1), and in 1978 again amended the Act to require a minimum wage for "each hour worked" (L 1978, ch 747, § 1).

The Act delegates to the Commissioner of Labor[1] the authority to set that minimum wage by issuing "wage orders" (L 1937, ch 276, §§ 555–557), which are promulgated as regulations in accordance with the State Administrative Procedure Act (SAPA) and the dictates of the Labor Law (see Labor Law § 659). The Commissioner has exercised this statutory authority periodically by publishing the minimum wage rate for employment in five industries, subclassified by occupation, employer size, and geographic location (12 NYCRR ch II, subch B, F).

Since 1972, home health care aides have come under DOL's Minimum Wage Order Number 11 for Miscellaneous Industries and Occupations (12 NYCRR part 142), which applies to all non-exempt employees who are not subject to a different wage order (i.e., those not in the hospitality industry, the building services industry, or farm workers) (see 12 NYCRR 142-2.14; DOL, Minimum Wage Order for Miscellaneous Industries and Occupations at 1 [effective Dec. 31, 2016] ["This Part shall apply to all employees, as such term is defined in this Part, except: (a) employees who are covered by minimum wage standards in any other minimum wage order promulgated by the commissioner; and (b) employees of a nonprofitmaking institution which has elected to be exempt from coverage under a minimum wage order, pursuant to subdivision 3 of section 652 of the Minimum Wage Act"]).

---

[1] The Act initially referred to the "Industrial Commissioner," which remained the title until 1982 when the Legislature renamed the position "Commissioner of Labor" (L 1982, ch 86, §§ 1–2). To avoid confusion, we refer to the individual holding this position as the "Commissioner."

The Wage Order states, in relevant part:

> "The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee. However, a residential employee—one who lives on the premises of the employer—shall not be deemed to be permitted to work or required to be available for work:
>
>> (1) during [the employee's] normal sleeping hours solely because [the employee] is required to be on call during such hours; or
>>
>> (2) at any other time when [the employee] is free to leave the place of employment" (12 NYCRR 142-2.1 [b]).

In March 2010, DOL issued an opinion letter, responding to questions about the application of the Wage Order to home health care aides, including the calculation of hours worked when assigned to a patient's home, referred to as a "live-in employee." The letter distinguishes between employees who are "on call"—meaning employees who are considered to be working during all hours they are required to remain in a particular work area, including when they are waiting to perform their services—and employees who are "subject to call" such that they are able to leave the work area between assignments and are paid only for work performed.

The letter further acknowledges that a "residential employee," defined in the Wage Order as a person who lives on the premises of the employer, is deemed not to be working during normal sleeping hours solely because they are "on call," or when free to leave the place of employment. The letter goes on to explain that DOL treats all "live-in" employees

the same when determining the number of hours worked, regardless of whether they are residential employees. Specifically, the letter states that

> "it is the opinion and policy of this Department that live-in employees must be paid not less than for thirteen hours per twenty-four hour period provided that they are afforded at least eight hours for sleep and actually receive five hours of uninterrupted sleep, and that they are afforded three hours for meals. If an aide does not receive five hours of uninterrupted sleep, the eight-hour sleep period exclusion is not applicable and the employee must be paid for all eight hours. Similarly, if the aide is not actually afforded three work-free hours for meals, the three-hour meal period exclusion is not applicable" (Opinion Letter from Maria L. Colavito, Counsel, DOL, Mar. 11, 2010).

The letter explains that home health care aides assigned to a 24-hour shift at a patient's home are live-in, non-residential employees, who must be paid for at least 13 hours of work. Under DOL's interpretation of the Wage Order, the remaining 11 hours of the shift are not included in the calculation of compensable hours because this time is allocated for eight hours of sleep and three hours of meal time for the employee. If the home health care aide does not receive a minimum of five hours uninterrupted sleep and work-free meal breaks, the employer must pay for every hour of a 24-hour shift—meaning the employer cannot exclude 11 hours from the compensable hours total—because when the aide is not provided with actual and substantial duty-free periods for personal use, the employer rather than the employee benefits from the time and the employer must pay for profiting off the employee's labor.

The March 2010 opinion letter, issued prior to the filing of plaintiffs' underlying actions and specifically addressed to the status of home health care aides, is only a recent

articulation in a long line of official statements by DOL explaining its general policy towards compensable work for 24-hour shift employees. For decades, DOL has consistently interpreted the Wage Order as applied across occupations to account for substantial periods of employee inactivity during a 24-hour shift when an employee is able to utilize the time for personal matters. As far back as 1969, DOL determined that, in the case of employees "required to be on duty for a 24 hour period," it would consider "up to 8 hours of sleeping time . . . as not being hours worked" within the meaning of the Wage Order, if certain conditions were met (DOL, Mem from George Ostrow to Daniel A. Daly [Oct. 27, 1969]). The exclusion would only apply if there was "express or implied agreement" to exclude time for sleep, the employer provided "adequate sleeping facilities for an uninterrupted night's sleep," the employee actually received five hours of sleep, and interruptions to perform duties were considered work time (id.).

In 1998, the Commissioner expressly addressed home health care aides, in response to a letter from an employee of a home health care provider and explained that, for "live-in" home health care aides, including those working an on-site 24-hour shift:

> "it is the policy of the [DOL] that such persons must be paid for no less than 13 hours of each 24-hour day they are required to remain 'on call' in the home of the person receiving their services—provided that they are afforded eight hours for sleep and actually receive five hours of uninterrupted sleep and that they are afforded three hours for meals. If a 'live-in' home health aide does not receive five hours of uninterrupted sleep the eight hour sleep period exclusion is not applicable, and the home health aide must be paid for all eight hours in question. Similarly, if a 'live-in' home health aide is not actually afforded three work-free hours for meals, the three-hour meal

period exclusion is not applicable" (DOL, Letter from James J. McGowan [Oct. 27, 1998]).

This interpretation of the Wage Order is similar to the federal government's guidance on the minimum compensable hours for 24-hour shift employees under the Fair Labor and Standards Act (FLSA). According to the United States Department of Labor, when an employee is "required to be on call for 24 hours a day," but has "a normal night's sleep" and "ample time in which to eat . . . meals," it may be "justif[ied to conclude] that the employee is not working at all times during which [the employee] is subject to call in the event of an emergency" (U.S. Dept. of Labor, Interpretative Bulletin No. 13: Hours Worked – Determination of Hours for Which Employees are Entitled to Compensation Under the Fair Labor Standards Act of 1938 [July 1939] at 4). Under current federal regulations, an employer may exclude up to eight hours of sleep time from compensable time for employees who work 24-hour shifts, assuming certain conditions are satisfied (29 CFR 785.22).

II.

Plaintiffs' putative classes based on defendants' alleged New York Labor Law violations

In both appeals, plaintiffs seek certification of a class of home health care aides for alleged violations of the Labor Law based on their respective employer's failure to pay putative class members a required minimum wage for each hour of a 24-hour shift. Plaintiffs care for some of the most vulnerable members of our society, doing work essential to the survival of their patients. Plaintiffs allege that they are part of a workforce that is predominantly composed of women and recent immigrants, and one that they claim

is easily exploited and vulnerable to various forms of wage abuse. Plaintiffs and amici paint a picture of a growing home health care industry where employers reap huge profits from both private and taxpayer funds, while refusing to pay the minimum wage for each hour worked to those who do challenging labor, at all hours of the day and night, often four or five times a week.

Defendants are private home health care companies and their owners who employ plaintiffs and other home health care aides to serve elderly and infirm patients for up to 24 hours at a time. Throughout these litigations, defendants maintained that the applicable law and DOL regulations do not mandate that they pay the equivalent of minimum wage for each hour of a 24-hour shift, relying on DOL's interpretation of its Wage Order.

A. <u>Andryeyeva v New York Health Care, Inc.</u>

Plaintiffs Lilya Andryeyeva and Marina Ordus are former employees of New York Home Attendant Agency, an entity formed by defendant New York Health Care (NYHC), a New York State Department of Health licensed home health care agency. They commenced an action individually and sought class certification on behalf of all other home health aides who were employed by NYHC and worked 24-hour shifts. NYHC provides home care services to elderly and disabled individuals in New York City and Nassau County pursuant to contracts with various managed care companies and local health departments. Defendants' home care aides assist patients with a range of tasks, including cooking, feeding, bathing, housework, using the restroom, and changing diapers.

NYHC regularly assigns home care aides to work 24-hour "sleep-in" shifts. During such shifts, a home care aide is required to be present in the patient's home for a full 24-hour period. Plaintiffs allege that defendants violated the Labor Law by failing to pay the required minimum wage, overtime, and "spread of hours" premiums[2] to home aides who worked 24-hour shifts. Plaintiffs allege they routinely did not receive five hours of uninterrupted sleep because their patients required assistance multiple times each night. Plaintiffs also allege that they were never allowed to take meal breaks; indeed, NYHC's orientation manual states expressly: "Patients are never to be left alone!" According to Andryeyeva, the patient for whom she cared most frequently suffered from dementia, "never" slept through the night, and "usually got up two or three times each night to use the bathroom," requiring assistance each time. Plaintiffs further allege they were never told that they should receive five hours of uninterrupted sleep during 24-hour shifts and that defendants failed to record when (or even whether) plaintiffs took sleep and meal breaks. Defendants maintain that home health care aides in their employ are "expected" to receive an eight-hour sleep break and three hours of meal breaks per 24-hour shift.

In support of their motion for class certification, plaintiffs argued that they met each of the statutory requirements of CPLR 901, namely, numerosity, predominance, typicality, adequacy of representation, and superiority. Plaintiffs argued that the proposed class includes 1,063 employees who suffered the same core injury, i.e., defendants' alleged

---

[2] Under DOL regulations, employers are required to pay a "spread of hours" premium of "one hour's pay at the basic minimum hourly wage rate" to a covered employee who works a shift of more than 10 hours (12 NYCRR 142-2.4 [1]).

failure to pay lawful wages for each hour worked during 24-hour shifts. Plaintiffs further asserted that they would fairly and adequately represent the class because they had actively participated in the litigation and selected qualified class counsel, and that class treatment was superior to other methods of adjudication because a single judicial adjudication would be more efficient than numerous individual determinations. Plaintiffs argued that they satisfied the requirements of CPLR 902—the interest of class members in controlling the litigation, the inefficiency of individual actions, the extent of prior litigation in the controversy, the desirability of concentrating the litigation in the forum, and any difficulties that may arise in the management of the class action—for many of the same reasons.

In opposition, defendants asserted that they were not required to pay the minimum wage to home care aides for each hour of a 24-hour shift because the aides were "live-in employees," and under DOL's March 2010 opinion letter, they could be paid less than the minimum wage for up to eight hours of sleep time and three hours of meal time. Therefore, defendants argued, each worker's claim required an individual examination of the facts and circumstances of their respective employment, rendering the claims unsuitable for class certification. Unpersuaded, Supreme Court refused to adopt DOL's interpretation and granted plaintiffs' motion to certify a class of home attendants who worked 24-hour shifts during a defined period.

The Appellate Division affirmed, concluding that "DOL's interpretation is neither rational nor reasonable, because it conflicts with the plain language of the Wage Order" (Andryeyeva v New York Health Care, Inc., 153 AD3d 1216, 1218 [2d Dept 2017]). The

court reasoned that, because plaintiffs were required to be present at the patient's home and to perform services as needed if called upon, they were "available for work," regardless of whether they were afforded sleep and meal breaks. In reaching this conclusion, the court held that the phrase "available for work" includes nighttime hours when the employee was "not called upon to perform services" (id. at 1219–1220). The court relied on the First Department's decision in Tokhtaman v Human Care, LLC (149 AD3d 476 [1st Dept 2017]), in which that court similarly rejected DOL's interpretation of the Wage Order as in conflict with its plain meaning. The Second Department further concluded that plaintiffs adequately established the requirements of CPLR 901 and that none of the CPLR 902 factors warranted a denial of the certification motion. The Appellate Division granted defendants' motion for leave to appeal pursuant to CPLR 5602 (a).

   B.  Moreno v Future Care Health Servs., Inc.

       Plaintiffs Adriana Moreno and Leonidas Peguero-Tineo are home health care aides employed by defendants Future Care Health Services, Inc. and Americare Certified Special Services, Inc. As in Andryeyeva, plaintiffs allege that defendants underpaid their employees by failing to pay the minimum wage for each hour of their assigned 24-hour shifts, not paying overtime, and failing to pay "spread of hours" premiums. The Moreno plaintiffs further allege that defendants failed to pay employees adequate wages to attend mandatory "in service" training sessions, reimburse employees for supplies or uniform cleaning, and maintain adequate employment records as required by Labor Law § 195 and 12 NYCRR 142-2.

Plaintiffs moved to certify "a class of current and former home health care workers employed by Defendants." Plaintiffs argued that they satisfied the requirements under CPLR 901 because the proposed class included at least 40 members and presented several common questions, including whether defendants "engaged in a pattern or practice of not paying all wages due for work performed and overtime" and "whether Defendants have kept true and accurate time records for all hours worked by Plaintiffs and the Class." They further argued that plaintiffs were adequate class representatives and had selected qualified counsel to prosecute the class wage claims. Finally, plaintiffs argued that class treatment was superior to other means of resolving their claims because requiring hundreds of class members to file separate actions alleging the same misconduct against the same defendants was inefficient and would waste judicial resources. Plaintiffs also argued that the requirements of CPLR 902 were satisfied.

Like the Andryeyeva defendants, the Moreno defendants responded in opposition that plaintiffs failed to establish grounds for certification because resolving plaintiffs' claims would require "individualized investigation, proof and determination." Defendants relied, in large part, on the fact that under DOL's interpretation of the Wage Order, plaintiffs' sleep and meal time was non-compensable and defendants were not obligated to pay the minimum wage for this time so long as plaintiffs received at least five hours of uninterrupted sleep and three hours for meals. With respect to plaintiffs' other claims, defendants asserted that there was no evidence to support plaintiffs' allegations. Defendants further argued that plaintiffs failed to satisfy CPLR 902, in part because the

individualized issues presented by the litigation were not appropriate for resolution in a class action. Supreme Court agreed with defendants that certification was unwarranted and denied plaintiffs' motion.

The Appellate Division reversed in an opinion decided the same day as <u>Andryeyeva</u>. The court concluded that the DOL opinion letter "conflicts with the plain meaning of" the Wage Order, and that home health care aides were entitled to be paid the minimum wage for every hour of a 24-hour shift even if they were afforded sleep and meal time because they are not "residential employees" within the meaning of the Wage Order (<u>Moreno v Future Care Health Servs., Inc.</u>, 153 AD3d 1254, 1255–1256 [2d Dept 2017]), citing <u>Andryeyeva</u>, 153 AD3d at 1219). The court further concluded that plaintiffs had established the prerequisites for class treatment and certified the proposed class. As in <u>Andryeyeva</u>, the Appellate Division granted defendants' motion for leave to appeal to this Court.

C.  <u>DOL's Emergency Regulation</u>

In direct response to these decisions and the holding in <u>Tokhtaman</u>, DOL issued an emergency regulation which added the following language to the Wage Order:

> "Notwithstanding the above, this subdivision shall not be construed to require that the minimum wage be paid for meal periods and sleep times that are excluded from hours worked under the Fair Labor Standards Act of 1938, as amended, in accordance with sections 785.19 and 785.22 of 29 C.F.R. for a home care aide who works a shift of 24 hours or more" (NY Reg, Oct. 25, 2017 at 6).

In DOL's Notice of Emergency Rulemaking, it announced that the emergency regulation was "needed to preserve the status quo, prevent the collapse of the home care industry, and avoid institutionalizing patients who could be cared for at home, in the face of recent decisions by the State Appellate Divisions that treat meal periods and sleep time by home care aides who work shifts of 24 hours or more as hours worked for purposes of state (but not federal) minimum wage" (id. at 5). In the accompanying Regulatory Impact Statement (RIS),[3] DOL explained that its interpretation had been long-standing, and evolved as legislative expansions covered workers in the home. DOL explained that by the 1970s, the Commissioner interpreted the minimum wage requirement to exclude sleep and meal periods for these groups of workers, and included this interpretation in formal guidelines, legal opinions, investigators' manuals and the Commissioner's determinations. The RIS further stated that the Commissioner amended the Wage Order in 1986 to provide for overtime calculation in accordance with federal methodology and "grew increasingly to look to, and rely upon federal FLSA regulations interpreting" federal law regarding work hours, meal and sleep periods, "so that hours worked were calculated consistently at the state and federal level for overtime (and other) purposes" (id. at 6).

The emergency regulation expired approximately two months later, on January 2, 2018. To avoid any lapse in coverage, DOL promulgated a series of substantially identical

---

[3] The RIS is a statutory requirement. Pursuant to SAPA, except under circumstances not relevant to these appeals, an agency shall "issue a regulatory impact statement for a rule proposed for adoption or a rule adopted on an emergency basis," containing information such as the statutory basis for the proposed rule, "needs and benefits," projected costs of the rule, and a compliance schedule (SAPA § 202-a [2]–[3]).

emergency regulations between January and September 2018, as well as a proposed final rule on April 5, 2018 (NY Reg., Apr. 25, 2018 at 43–45). Then, in a separate action by different plaintiffs, Supreme Court invalidated the emergency regulation in September 2018, holding DOL failed to justify an emergency in accordance with the SAPA (see Matter of Chinese Staff and Workers Association v Reardon, 2018 NY Slip Op 32391(U), at *8 [Sup Ct, NY County 2018]).

III.

As defendants' respective challenges to the Appellate Division's approval of class certification in Andryeyeva and Moreno are analytically indistinguishable, we address these matters jointly. Defendants argue the Appellate Division should have deferred to DOL's rational and reasonable interpretation of the Wage Order, which requires individualized assessment of plaintiffs' minimum wage claims, thus precluding certification of a class. Plaintiffs in both appeals submit the same response namely, that the plain language of the Wage Order requires defendants to pay them minimum wage for every hour of their 24-hour shifts and issues common to their respective classes are defendants' alleged failure to comply with the Wage Order and with regulatory recording keeping requirements.[4] Given the decisions below and the arguments as narrowed by defendants, the only issues before us are whether the Appellate Division erroneously disregarded DOL's interpretation of its Wage Order and, if so, whether application of the

---

[4] Plaintiffs have not argued that DOL's interpretation of the Wage Order conflicts with New York State's Labor Law and no such question is presented in these appeals.

DOL's interpretation necessarily forecloses class certification. As we discuss, because of the posture of these appeals, we remit so that the courts below may consider unaddressed grounds for class certification.

A. Standard of Judicial Review

Our review of DOL's interpretation of its Wage Order is quite circumscribed. As a general rule, "courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise" (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]). Thus, an agency's construction of its regulations "'if not irrational or unreasonable,' should be upheld" (Samiento v World Yacht Inc., 10 NY3d 70, 79 [2008], quoting Matter of Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d 597, 604 [2005]). However, "courts are not required to embrace a regulatory construction that conflicts with the plain meaning of the promulgated language" (Visiting Nurse Serv. of New York Home Care v New York State Dept. of Health, 5 NY3d 499, 506 [2005], citing Matter of 427 W. 51st St. Owners Corp. v. Division of Hous. & Community Renewal, 3 NY3d 337, 342 [2004]). Judicial deference to an agency's interpretation of its rules and regulations is warranted because, having authored the promulgated text and exercised its legislatively delegated authority in interpreting it, the agency is best positioned to accurately describe the intent and construction of its chosen language (see Peckham, 12 NY3d at 431).

When an agency adopts a construction which is then followed for "a long period of time," such interpretation "is entitled to great weight and may not be ignored" (Ferraiolo v

O'Dwyer, 302 NY 371, 376 [1951]). Further, when set forth in official statements, an agency's consistent interpretation reflects an enduring body of informed administrative analysis (see Samiento, 10 NY3d at 79), and provides a reviewing court with the agency's interpretive position, as well as a measure of the enduring quality of the administrative judgment. Indeed, we have previously given weight to DOL's opinion letters when deciding whether to defer both to DOL's interpretation of its own regulations as well as the Labor Law (see e.g. Samiento, 10 NY3d at 79–80 [relying on DOL's opinion letters to support upholding DOL's interpretation of Labor Law § 196-d]).

We have no occasion to deviate from our well-settled law in the appeals before us. Thus, if DOL's interpretation of the Wage Order meets our deferential standard, we may not reject it. In making our determination, we must give our foremost consideration to DOL's opinion letters and prior statements because they represent a long-standing articulation of its interpretation of the Wage Order, as applied to nonresidential 24-hour shift employees, including home health care aides. We are also mindful that DOL's fair and studied consideration is grounded in its specialized knowledge and experience of both round-the-clock work assignments and the home health care industry.

There is nothing "novel" (dissenting op at 11) about the standard of review we reiterate today. As revealed by the case law cited above, judicial deference to an agency's interpretation of its own regulations is a basic tenet of administrative law. The dissent appears to confuse our discussion of the well-established justifications for deference (e.g., administrative expertise and the fact that an agency is best positioned to explain what it

meant by the words it chose) for the standard itself. Further, the dissent relies on case law addressing agency interpretation of statutory—not regulatory—text to bootstrap an inapposite rule and observes that an agency's interpretation is entitled to no deference "where 'the question is one of pure legal interpretation of statutory terms'" (dissenting op at 10 [quoting Matter of Toys "R" Us v Silva, 89 NY2d 411, 419 [1996] [concluding that a municipal zoning board's determination revoking a building permit was not inconsistent with local zoning code]). That rule does not apply to an agency's interpretation of its own regulations. As noted above, the Court "*must* defer to an administrative agency's rational interpretation of its own regulations" (Peckham, 12 NY3d at 431 [emphasis added]; see also Visiting Nurse Serv., 5 NY3d at 506).

## B.  DOL's interpretation of the Wage Order

The Wage Order does not define what it means for an employee to be "required to be available for work at a place prescribed by the employer" (see 12 NYCRR 142.21 [b]). DOL has interpreted the phrase as applied to employees assigned to 24-hour shifts, (including home health care aides), to exclude up to 11 hours for sleep and meal breaks from compensable hours, based on DOL's understanding that these are regularly scheduled substantial periods of assignment-free personal time. DOL, appearing as amicus curiae, argues that we should defer to its construction because it is consistent with the plain text of the Wage Order, and reflects DOL's well-founded concern for the well-being of workers on round-the-clock assignment, informed judgment grounded in its specialized knowledge of the home health care industry, and the Commissioner's election to align the state's

requirements with the federal approach. Upon our review of the Wage Order and DOL's policy statements, we conclude that DOL's interpretation is not inconsistent with the plain language as promulgated, nor is it an irrational or unreasonable construction of the Wage Order as applied to 24-hour shift workers.

DOL's interpretation is not inconsistent with the plain text of the Wage Order, which requires that an employee be paid the minimum wage for the time when they are "required to be available for work at a place prescribed by the employer" (12 NYCRR 142-2.1 [b]). That language requires both presence and an availability during a time scheduled for actual work. Plaintiffs mistakenly argue, and the Appellate Division erroneously concluded, that once a worker is physically present at the designated work site, they are thus able to work if called upon and so are "available for work." That interpretation ignores the entirety of the phrase and renders superfluous the regulation's separate requirement that the employee be both "available for work" and be so available "at a place prescribed by the employer," in violation of two fundamental rules of statutory construction that apply with equal force in the administrative regulatory text:  words must be "harmonize[d]" and read together to avoid surplusage (Matter of Tall Trees Const. Corp. v Zoning Bd. of Appeals of Town of Huntington, 97 NY2d 86, 91 [2001]; Matter of Kamhi v Planning Bd. of Town of Yorktown, 59 NY2d 385, 391 [1983]; see also FDA v Brown & Williamson Tobacco Corp., 529 US 120, 132–133 [2000]); cf. McKinney's Cons. Statutes § 98 ["All parts of a statute must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute

and every part and word thereof"]). Put another way, if plaintiffs are correct that the only

meaning that may be ascribed to this language is physical presence in the patient's home,

then the Wage Order is internally redundant as it already conveys that with the words "or

required to be at a place prescribed by the employer." By contrast, DOL has given meaning

to the complete phrase by interpreting "available for work," in the context of a 24-hour

shift to exclude the hours when the employee is not working because the employee is on a

scheduled sleep and meal break (see Roberts v Tishman Speyer Properties, L.P., 13 NY3d

270, 289 [2009] [meaning must be given to "every part and word"]). Moreover, plaintiff's

alternative reading of the Wage Order is beside the point. "That [DOL's] interpretation

might not be the most natural reading of the regulation, or that the regulation could be

interpreted in another way, does not make the interpretation irrational" (Elcor Health

Servs., Inc. v. Novello, 100 NY2d 273, 280 [2003]).[5]

---

[5] The dissent rejects DOL's interpretation of "available for work," in part, because home health care aides "provid[e] 24-hour patient care without meaningful breaks" (dissenting op at 8; see also dissenting op at 16 [plaintiffs are entitled to "a day's wages for a day's work"]). This conclusion assumes plaintiffs' allegations are true. If defendants complied with DOL's guidance, then plaintiffs should have been paid the minimum wage for every hour worked and received the required sleep and meal breaks. If, as plaintiffs allege and the dissent apparently accepts, plaintiffs worked 24-hour shifts without "meaningful breaks," then, as DOL agrees, plaintiffs would be entitled to compensation for the entire 24-hour period. In fact, it is possible that a home health care aide may be paid for *more* hours than they actually work under DOL's interpretation. If an aide receives a modicum of sleep below the five-hour minimum and less than three hours of meal breaks, the employee must be paid for the full 24 hours. There is nothing irrational about this construction of the Wage Order, nor is it inconsistent with the plain language of the regulatory text.

When it first adopted the Wage Order in 1960, DOL recognized the difficulty of defining hours worked for employees who are on call around the clock and the hardship imposed at setting a work day at 24 hours (DOL, Report of the Industrial Commissioner Upon the Promulgation of Minimum Wage Order No. 11 for Miscellaneous Industries and Occupations [Sept. 29, 1960] at 6). Nevertheless, the realities of the workplace are such that there are many industries and occupations where employees are assigned to 24-hour shifts. This is not a case where DOL has vacillated in its position, rendering its interpretation capricious or unmoored from the realities of workplace life. DOL's interpretation of the Wage Order language has been consistent for nearly five decades, during eight gubernatorial administrations and the tenure of 13 Commissioners of Labor, representing the same fair and studied judgment of officials throughout that time. DOL's position has been set forth and explained in its Investigator's Manual, DOL memoranda, and opinion letters, up to its recent March 2010 correspondence. As intended, this articulated position has informed and guided the industries that rely on 24-hour shift workers, including home health care services employers. This consistent interpretation is further support for this Court's deference to the DOL's reading of its own Wage Order (see Barenboim v Starbucks Corp., 21 NY3d 460, 471 [2013]).[6]

---

[6] The dissent's contention that DOL's interpretation has "'vacillated' dramatically" (dissenting op at 14) is unfounded. The substance of DOL's interpretation is that employees who work 24-hour shifts and receive bona fide, uninterrupted sleep and meal breaks are not "working" within the meaning of the Wage Order during those breaks, unless actually called upon to perform tasks. The dissent does not argue—because it cannot—that DOL has departed from this core understanding in any of the publications it has issued over the past 50 years. Instead, the dissent quibbles that DOL stated in 1972 that the exclusion only

Here, DOL explains that its interpretation is an attempt to apply the Wage Order's requirement that workers be paid for the time that they are "required to be available for work at a place prescribed by the employer" (12 NYCRR 142-2.1 [b]) with the realities of in-home health aides who work 24-hour shifts. According to its brief in this Court, DOL has "concluded that an employee who enjoys genuine sleep and meal breaks consistent with the strict requirements of DOL's policy—i.e., regularly scheduled, substantially uninterrupted, work-free times to eat and sleep—is not meaningfully 'available for work' during those breaks, precisely because DOL's criteria are intended to identify breaks that are predictably and largely free from work interruptions." This echoes the position it took in its 2010 opinion letter, where DOL distinguished between employees who are "on call" and "considered to be working during all the hours that they are confined to the workplace including those hours in which they do not actually perform their duties" and those who are "subject to call," which includes "that time in which employees are permitted to leave the work room or workplace between work assignments to engage in personal pursuits and activities" (2010 Opinion Letter at 3). DOL has concluded that "[i]n some cases, employees who are 'subject to call' may be restricted to a specified area, to be reachable by telephone

_____

applies when sleep breaks are "bona fide" and "regularly scheduled" and "[a]dequate sleeping facilities" are "provided," but then explained 16 years later that, as "a rule of thumb," DOL considered 13 hours to be the "'normal standard for working time' for home health care aides" (dissenting op at 15). Minor variations in DOL's articulation do not change the fact that DOL has never said that a home health care aide must be paid the minimum wage for every hour of a 24-hour shift in all circumstances. Instead, DOL has consistently maintained that home health care aides are not "available for work" within the meaning of the Wage Order during sleep and meal breaks, but must be compensated if called upon to work.

or otherwise, to report to the work assignments within 15 to 30 minutes, etc. In cases in which an employee is 'subject to call,' working time starts when they are actually ordered to a specific assignment or at the time in which they perform work for the employer" (id.). In adopting its interpretation, DOL "sought to protect . . . employees' ability to engage in a significant degree of personal activity during their breaks by imposing strict rules that employers must comply with if they wish to exclude such breaks from compensable time."

Moreover, DOL's interpretation of the Wage Order reflects its specialized knowledge of labor law's evolving application to domestic workers and the home health care industry (see International Union of Painters, 32 NY3d at 208–209; Matter of KSLM-Columbus Apts., Inc v New York State Div of Hous. & Community Renewal, 5 NY3d 303, 312 [2005]). It further reflects DOL's expertise in handling labor law violations and its historical efforts to ensure that its policies reflect the realities of the diverse industries and occupations over which it has administrative oversight. With respect to home health care aides, this interpretation of the Wage Order is supported by DOL's experience with the particularities of this occupation, where the needs of some patients allow for regularly scheduled work-free uninterrupted periods to sleep and eat. In other words, DOL has determined that a patient may need an aide on site around-the-clock without requiring adult care services for all 24 hours of the day. Indeed, defendants maintain that when a patient requires full-time attention and care, two home health care aides are, or ought to be, assigned to separate twelve-hour shifts. DOL's interpretation based on this industry reality is neither irrational nor unreasonable.

DOL's interpretation also reflects the Commissioner's interest in conforming state and federal guidance on the proper calculation of compensable hours. Interpreting the Wage Order to exclude sleep and eating breaks in a 24-hour shift, on the presumption that the employer will in fact structure the work assignment to provide such time for a home health care aide, harmonizes with the federal approach. It is neither unreasonable nor irrational for DOL to interpret its Wage Order in a manner that reduces administrative burdens, such as dual-sovereign reporting and wage payment requirements, and also has the added benefit of avoiding intergovernmental conflict.[7]

Plaintiffs unpersuasively argue that DOL's interpretation is a misapplication of the residential exception set forth in the Wage Order. Contrary to plaintiffs' suggestion, the Wage Order's treatment of residential employees is not an exception or a particularized carve-out (which creates nothing more than a general exception) (see e.g. Mullen v. Zoebe, Inc., 86 NY2d 135, 142 [1995]). The Wage Order does not exclude residential employees from coverage, but rather, subjects these workers to a particular interpretation of compensable hours, grounded in DOL's knowledge and experience with this type of work. Nor do plaintiffs argue that a home health aide working a 24-hour shift who does not live in the employer's residence is a residential employee for purposes of the Wage Order

---

[7] The dissent is mistaken that the Court "seeks to emulate" the federal regulatory scheme (dissenting op at 12). The Court is not emulating or adopting any particular approach. Instead, we have applied our well-established jurisprudence to defer to DOL's interpretation because it is neither irrational nor unreasonable and is not contrary to the regulatory text. However, as explained above, we cannot see how it would be irrational or unreasonable for DOL to track the federal approach with respect to sleep and meal breaks for employees who work 24-hour shifts.

(Matter of Settlement Home Care, Inc. v Industrial Bd. of Appeals of Dept. of Labor, 151

AD2d 580, 581 [2d Dept 1989]). Instead, such an employee is covered under the remaining

language of the Wage Order, language which DOL applies to an employee assigned to a

24-hour shift. Nothing in the Wage Order language precludes DOL from interpreting the

remainder of the provision and, specifically, the "available for work" language, as

implementing a similar approach to compensable hours for non-residential home health

care employees working 24-hour shifts. Moreover, there is nothing unreasonable or

irrational about recognizing the similarities and dissimilarities between residential and

nonresidential employees to reach the conclusion that a home health care aide assigned to

a 24-hour shift should have significant amounts of regularly scheduled work-free periods.[8]

Plaintiffs' argument is essentially a claim that DOL must issue a separate wage order

for home health care aides. Although courts must ensure that administrative entities comply

with their statutory, regulatory, and SAPA requirements in exercising their legislatively

delegated powers, DOL's highly fact-specific, industry-specific interpretation of its own

---

[8] The dissent argues that the residential employee provision "expressly exclude[s]" such
employees' sleeping hours, and so "it must follow" that sleep time is otherwise
compensable under the Wage Order (dissenting op at 6–7). This analysis is
fundamentally flawed. Contrary to the dissent's claim, the clause does not "expressly
exclude[]" a residential employee's sleeping hours from compensable time. Rather, it
clarifies that sleeping hours "shall not be deemed" work hours "*solely because* [the
employee] is required to be on call during such hours" (12 NYCRR 142-2.1 [b] [1]
[emphasis added]). The dissent contends that this language indicates that sleep time for
all other employees "should be compensated *solely* because they are on call" (dissenting
op at 7). However, the Wage Order's text does not compel that interpretation, and DOL
has reasonably determined that home health care aides are not "on call" when asleep and
certain conditions are satisfied.

Wage Order is a far cry from the "fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers" that requires a separate rulemaking under SAPA (Roman Catholic Diocese of Albany v New York State Dept. of Health, 66 NY2d 948, 951 [1985]). Apart from the fact that DOL complied with procedural requirements when it promulgated the Wage Order, and plaintiffs do not argue to the contrary, plaintiffs' interpretation devolves to a requirement that DOL issue individualized wage orders for each of the numerous occupations across a variety of industries for which it has administrative responsibility. Plaintiffs' approach is in contravention of the Act's requirement of periodic publication of Wage Orders, is unworkable in practice and ignores DOL's administrative knowledge of how best to address the common concerns that arise for 24-hour shift workers.[9]

Significantly, DOL's interpretation is congruent with the enforcement provisions of the Labor Law, which authorize private and regulatory enforcement actions for wage theft and other minimum wage law violations as a means to hold an employer accountable for abuse and exploitation of its workers (Labor Law § 663 [1]–[2]). DOL has determined that

---

[9] The dissent appears to embrace this position, concluding that deference to DOL's interpretation allows the agency to "circumvent statutory safeguards in favor of 'interpretations'" (dissenting op at 12). The dissent's position is unprecedented and would upset established administrative law doctrine. Issuing interpretative guidance is a critical aspect of an agency's role, allowing regulated entities to understand how the law applies to their unique and varied circumstances. As noted above, the Wage Order was duly promulgated pursuant to SAPA. To require DOL to issue a separate regulation for every circumstance facing every profession is not required under SAPA and would impose staggering burdens on the State's administrative agencies.

it can avoid exploitation of these employees by interpreting its Wage order to mandate a substantive period for sleep and meals to directly benefit the employee. The employer must pay when the employee is interrupted during these breaks for any time worked and must pay for the entire break when the employee does not receive the requisite hours of sleep and meal breaks. In other words, when the employee is able to take the prescribed eight hours of sleep and three hours of meal breaks, the home health care aide is paid for working the remaining time of the 24-hour shift—13 hours. If, in fact, the aide does not receive the minimum break time because the patient needs assistance, the aide is paid for 24 hours of work time. As DOL confirms, failure to provide a home health care aide with the minimum sleep and meal times required under DOL's interpretation of the Wage Order is a "hair trigger" that immediately makes the employer liable for paying every hour of the 24-hour shift, not just the actual hours worked. Thus, even if a home health care aide sleeps without interruption for four hours and 59 minutes, but is not able to obtain five full hours of sleep, DOL mandates the employer pay for the entire eight hours allotted for sleep. This is not inconsistent with interpreting the Wage Order's mandate as requiring an employee be paid for when they are intended to be available for work, and there is nothing unreasonable or irrational about interpreting "available for work" in this way. Indeed, under DOL's interpretation of the Wage Order, a home health aide is paid for every hour during which patient care is actually provided.

While we ultimately conclude that the Appellate Division failed to afford adequate deference to DOL's interpretation of the Wage Order, we do not ignore plaintiffs' and

amici's claims that a vulnerable population of workers is being mistreated. Plaintiffs' allegations are disturbing and paint a picture of rampant and unchecked years-long exploitation. Plaintiffs allege, among other things, that they rarely received required sleep and meal time during 24-hour shifts, were expected and required to attend to patients numerous times each night, and that defendants failed to track actual hours worked or make a serious effort to ensure adequate sleep and meal times, as required by law. In concluding that DOL's interpretation of the Wage Order is rational, we express no opinion on the ultimate merits of plaintiffs' claims. Moreover, to the extent plaintiffs' allegations suggest current enforcement priorities and methods are inadequate, it is for DOL and the Legislature, not this Court, to consider whether the sleep and meal time exemption is a viable methodology to ensure employer compliance with the law and proper wage payment in the case of home health care aides.

IV.

Class Certification

Defendants in both appeals argue that, assuming we defer to DOL's interpretation of the Wage Order, individual issues preclude class certification.[10] According to defendants, because each putative class member's claim is fact-specific and turns on

---

[10] The Andryeyeva defendants apparently concede that if we adopt plaintiffs' interpretation of the Wage Order, there is no statutory or factual impediment to class certification. The Moreno defendants contend that, regardless of whether the Court adopts DOL's interpretation, plaintiffs failed to offer sufficient evidence to satisfy the numerosity, commonality, or typicality requirements.

whether the health care aide received the requisite number of uninterrupted sleep and meal hours, plaintiffs may not offer generalized proof on a class-wide basis. While we do not pass on the ultimate merits of plaintiffs' class certification motions, we observe that New York's statutory class certification provisions are to be liberally construed (City of New York v Maul, 14 NY3d 499, 509 [2010]; Sponsor's Mem at 1, Bill Jacket, L 1975, ch 207 [Article 9 was intended to replace New York's prior "restrictive" class action rules which "fail(ed) to accommodate pressing needs for an effective, flexible and balanced group remedy"]. CPLR article 9 recognizes that certain claims are unlikely to be litigated because the costs of individual cases outweigh the possible damages, thus making those cases unattractive to the private bar and resource-strapped government and nonprofit entities (see Sperry v Crompton Corp., 8 NY3d 204, 213 [2007] ["class actions are designed in large part to incentivize plaintiffs to sue when the economic benefit would otherwise be too small, particularly when taking into account the court costs and attorneys' fees typically incurred"]; Sponsor's Mem at 1, Bill Jacket, L 1975, ch 207 ["(Article 9) will enable persons similarly aggrieved to enforce existing substantive rights, which presently go without redress solely because of the financial impracticability of financing individual suits"]; 82 NY Jur 2d § 254 ["The statutory criteria governing the permissibility of class actions should be liberally construed so as to allow for the adjudication of claims that would not be economically litigable except by means of a class action"]).

Plaintiffs allege, and claim there is evidence of, defendants' systemic violations of the Wage Order and Labor Law, such as defendants' failure to adequately compensate

home health care aides when they did not receive the minimum time for sleep and meal breaks during their 24-hour shifts, maintain adequate records of, or compensate for, the hours actually worked, and provide appropriate sleep facilities. Claims of uniform systemwide violations are particularly appropriate for class certification (see e.g. Maul, 14 NY3d at 513–514). Indeed, plaintiffs' allegations suggest a policy or practice of unlawful action of the type our courts have previously found ripe for class treatment (see id. at 513 [affirming certification of a class challenging "a de facto policy followed by (a city agency) of delaying the receipt of services as a result of its practices"]; Labor Law § 661; 12 NYCRR 142-2.6 [a] [4] [requiring employers to maintain records of "the number of hours worked daily and weekly"]). DOL maintains that if plaintiffs establish prima facie that defendants failed to comply with Labor Law and regulatory record keeping requirements that the burden would shift to defendants to establish they maintained the required work records, serving as another basis for class certification. We do not reach the underlying legal question raised by DOL's argument, but note only that assertion of these types of common questions may be considered by the courts in determining whether class certification is appropriate.

Conversely, the fact that damages may vary by class member does not per se foreclose class certification. As we have explained, "the legislature enacted CPLR 901 (a) with a specific allowance for class actions in cases where damages differed among the plaintiffs, stating 'the amount of damages suffered by each class member typically varies from individual to individual, but that fact will not prevent the suit from going forward as

a class action if the important legal or factual issues involving liability are common to the

class'" (Borden v 400 E. 55th St. Assocs., L.P., 24 NY3d 382, 399 [2014], quoting Mem

of State Consumer Protection Bd at 3, Bill Jacket, L 1975, ch 207). A difference in damage

awards is an insufficient basis to deny certification as a matter of law where the class may

rely on representative evidence of the class-wide violations (see id.).[11]

Given the posture of these appeals—where the Appellate Division determined that

class certification was appropriate under its erroneous interpretation of the Wage Order—

we may not consider unaddressed or alternative grounds proffered for class certification.

The courts below are charged with that task in the first instance and therefore we remit for

that determination.

V.

For the reasons discussed, the Appellate Division orders should be reversed and the

matters remitted to permit the courts below to evaluate the issues in accordance with DOL's

interpretation of the Wage Order and to consider alternative bases for class certification. In

Andryeyeva, because Supreme Court certified the class upon finding that DOL's

interpretation did not apply to plaintiffs, and the Appellate Division affirmed, neither court

reached the issue of whether class certification is otherwise warranted.  Accordingly, in

---

[11] The Andryeyeva defendants' argument that Andryeyeva's disavowal of liquidated damages was an insufficient waiver on behalf of the class is without merit as she clearly stated she was waiving the liquidated damages claim in order to pursue the matter as a class action (see Borden, 24 NY3d at 394).

<u>Andryeyeva</u>, the Appellate Division order should be reversed, with costs, the matter remitted to Supreme Court for further proceedings in accordance with this decision, and the certified question answered in the negative. In <u>Moreno</u>, Supreme Court considered all of plaintiffs' alternative bases for class certification under DOL's interpretation of the Wage Order and the Appellate Division reversed based on that court's rejection of DOL's interpretation of the Wage Order.  Accordingly, in <u>Moreno</u>, the Appellate Division order, insofar as appealed from, should be reversed, with costs, the matter remitted to the Appellate Division for further proceedings in accordance with this decision, and the certified question answered in the negative.

Lilya Andryeyeva v New York Health Care, Inc.
Adriana Moreno v Future Health Servs., Inc.
Nos. 11 & 12

GARCIA, J. (dissenting):

Workers are entitled to a minimum wage for each hour worked (Labor Law § 652

[1]). Today, the majority defers to a New York State Department of Labor (DOL)

interpretation of a wage order, allowing home health care aides to be paid an hourly rate

- 1 -

less than minimum wage.  That result is not only unfair, it is completely at odds with the plain text of the wage order.  Accordingly, I dissent.

I.

The Minimum Wage Act, first enacted in 1937, was designed to address the financial hardship faced by those receiving "wages insufficient to provide adequate maintenance for themselves and their families" (Labor Law § 650).  Payment of insufficient wages, the legislature noted, "threatens the health and well-being" of our State's workers (id.).  In enacting the Minimum Wage Act, the legislature sought to provide relief "as rapidly as practicable without substantially curtailing opportunities for employment or earning power" (id.).  Minimum wage standards are vital to accomplishing that goal (id.; see West Coast Hotel Co. v Parrish, 300 US 379, 398-399 [1937] ["minimum wage requirements" prevent "the exploiting of workers at wages so low as to be insufficient to meet the bare cost of living"]).  Given these important policy objectives, and the careful balancing critical to setting a minimum wage, the Minimum Wage Act sets forth a detailed procedure for issuing wage orders—one that mandates transparency and the inclusion of various affected stakeholders (see Labor Law §§ 655-659).

As a first step, the Commissioner must convene and appoint a "wage board . . . composed of not more than three representatives of employers, an equal number of representatives of employees, and an equal number of persons selected from the general public" (Labor Law § 655 [1]).  The wage board has extensive authority.  It has the power to "conduct public hearings," "consult with employers and employees," issue subpoenas

for "testimony . . . and books, records, and other evidence," and "cause depositions" (Labor Law § 655 [3]). The wage board's end goal is, with the approval of a "majority of its members," to "submit to the [C]ommissioner a report, including its recommendations as to minimum wages" in certain occupations (Labor Law § 655 [4]).

The wage board's submission of a report is followed by continued dialogue and consultation. The Commissioner is statutorily obligated to "publish a notice" of the report and to receive "objections to the report and recommendations" (Labor Law § 656). The Commissioner may then "accept . . . the board's report and recommendations"—potentially with modifications—or "reject" them (Labor Law § 657). If the board's report and recommendations are accepted, "[t]he Commissioner . . . thereafter issues a wage order setting a minimum wage in a specific occupation" (National Rest Ass'n v Comm'r of Labor, 141 AD3d 185, 192 [3d Dept 2016]). The statute also contemplates further amendments; after the wage order "has been in effect for six months or more," the same wage board may be "reconvene[d]" by the Commissioner or on a "petition of fifty or more residents . . . in or affected by" the covered occupations (Labor Law § 659 [1]). "[A]ny minimum wage order . . . issued by the [C]ommissioner . . . shall, unless appealed from . . . be final" (Labor Law § 657 [1]).

This exhaustive process complies, as it must, with the strictures of the State Administrative Procedures Act (SAPA) (see majority op at 3). SAPA was formulated "[a]fter years of study . . . to guarantee that the actions of administrative agencies conform to uniform, sound and equitable standards" (Cortlandt Nursing Home v Axelrod, 66 NY2d 169, 177 [1985]). Among other things, SAPA "outlines uniform administrative procedures

that State agencies must follow in their rule making, adjudicatory and licensing processes"

(Industrial Liaison Comm of Niagara Falls Area Chamber of Commerce v Williams, 72

NY2d 137, 144 [1988]).

DOL's Minimum Wage Order Number 11 for Miscellaneous Industries and

Occupations (the Wage Order) was passed in 1960 in accordance with the procedures

required by SAPA and the Minimum Wage Act (see 12 NYCRR 142-2.14; see also Report

of the Industrial Commissioner Upon the Promulgation of Minimum Wage Order No. 11

for Miscellaneous Industries and Occupations 1 [Sept 29, 1960]).  In relevant part, the

Wage Order provides:

> "The minimum wage shall be paid for the time an employee is permitted to work,
> or is required to be available for work at a place prescribed by the employer, and
> shall include time spent in traveling to the extent that such traveling is part of the
> duties of the employee.  However, a residential employee—one who lives on the
> premises of the employer—shall not be deemed to be permitted to work or required
> to be available for work:
>
> > (1) during [the employee's] normal sleeping hours solely because [they are]
> > required to be on call during such hours; or
> >
> > (2) at any other time when [the employee] is free to leave the place of
> > employment" (12 NYCRR 142-2.1 [b]).

As relevant here, the Wage Order mandates minimum wage compensation whenever an

employee is "available for work at a place prescribed by the employer" (12 NYCRR 142-

2.1 [b]).  The Wage Order contains only one exception—applicable only to residential

employees—permitting employers to deduct certain hours' of pay that would otherwise

be compensable.

## II.

Plaintiffs are non-residential home health care aides who work 24-hour shifts. During each shift, home health care aides are required to be present in the patient's home for the full 24-hour period (majority op at 9). They assist with a variety of tasks integral to a patient's daily functioning: "cooking, feeding, bathing, housework, using the restroom, and changing diapers" (majority op at 8). According to plaintiffs' allegations, home health care aides routinely do not receive meal breaks or adequate time for uninterrupted sleep, as their patients require assistance throughout the shift. As one employer's orientation manual states: "Patients are never to be left alone!" Plaintiffs further allege that defendants failed to record when (or even whether) plaintiffs took sleep and meal breaks, making it impossible to reconstruct their actual hours of work.

All agree that the Wage Order applies to plaintiffs in this case, and that plaintiffs do not fall within the Wage Order's "residential employee" exception (see majority op at 24-25). Though home health care aides are nowhere excepted from minimum wage requirements, DOL nonetheless contends that the Wage Order should be interpreted to exclude eleven hours of each plaintiff's work day: eight hours for "sleep time" and three hours for "meal time." Specifically, DOL argues that the phrase "available for work at a place prescribed by the employer" imposes two distinct requirements—"available for work" and "at a place prescribed by the employer"—such that physical presence on the premises is, by itself, inadequate for an employee to be deemed "available for work" (majority op at 19-20). In other words, DOL contends that, for non-residential employees like plaintiffs, the Wage Order should be interpreted to require both "presence and an

availability during a time scheduled for actual work" (majority op at 19). Applying that interpretation, DOL asserts that home health care aides are not technically "available for work" during "sleep time" and "meal time," and therefore they need not be paid for those periods.

DOL (and the majority) may be correct that the Wage Order's "available for work" requirement entails more than physical presence at a place prescribed by the employer (majority op at 19). Unlike mere presence, the notion of availability implies that an employee is "ready, willing, and able to" take on work (Black's Law Dictionary, Available for Work [10th ed 2014]). Thus, an employee might not be "available for work" at a time when, for instance, the employee cannot be reached, or is otherwise guaranteed to remain undisturbed. Plaintiffs, then, must be both present and "available for work"—not merely present—to be entitled to minimum wage compensation.

But DOL (and the majority) cannot be correct that plaintiffs' sleep time may be excluded from their wages. Under the Wage Order's single exception—not applicable to plaintiffs—residential employees' "sleeping hours" are expressly excluded from the time they are considered "available for work," thereby allowing employers to deduct those hours' of pay. By providing that, for residential employees, sleep hours *do not* constitute time the employee is "available for work," the exception signifies that, for all other employees, sleep hours *do* constitute time they are "available for work"—and, accordingly, must be paid (Walker v Town of Hempstead, 84 NY2d 360, 366–67 [1994] [noting that it is "not . . . necessary" to provide exceptions to a general term if they "fall within the preceding general proscription"]; McKinney's Cons. Law of NY, Book 1, Statutes § 213

[noting that an exception encapsulates items that would "otherwise would fall within (the) scope" of a term]; CJS Statutes § 505 [noting that an exception operates to "remov(e) something . . . which would otherwise be within" the clause to which it applies]). Put differently, because residential employees' sleep hours are specifically excluded from compensable time, it must follow that sleep hours would otherwise constitute time for which the employee must be compensated; if sleep time did not fall within "available for work" time, there would be no need to expressly exclude it. Accordingly, while the "available for work" requirement might demand more than physical presence—for instance, prompt readiness or accessibility—it *cannot* exclude "sleeping hours" for non-residential employees.

The majority asserts that the "residential employee" exception does not "exclude" sleeping hours from compensable time, but rather serves only to "clarif[y] that sleeping hours shall not be deemed work hours *solely because* the employee is required to be on call during such hours" (majority op at 25 n 8 [quotation marks, brackets, and citation omitted]). Whether called an "exception" or a "clarification," the provision's import is the same: In specifying that a residential employee's sleeping hours should <u>not</u> be compensated *solely because* the employee is on call, the provision signifies that—for all other employees— sleeping hours <u>should</u> be compensated *solely because* they are on call.

By distinguishing residential from non-residential employees in this way, the Wage Order reflects the policies of dignity and fairness advanced by the Minimum Wage Act. Residential employees, by definition, have living quarters on the premises and are provided regular periods of rest. "In the ordinary course of events," a residential employee "has a

normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits," and "the employee may be free to come and go during certain periods" (U.S. Dept. of Labor, Interpretative Bulletin No. 13: Hours Worked – Determination of Hours for Which Employees are Entitled to Compensation Under the Fair Labor Standards Act of 1938 [July 1939] at 3).  Recognizing this unique arrangement, the Wage Order permits employers to deduct a residential employee's "sleeping hours," as well as time when the employee is "free to leave the place of employment" (12 NYCRR 142-2.1 [b]).

Those presumptions of ample free time and private pursuits do not apply to non-residential home health care aides, who "do challenging labor, at all hours of the day and night" (majority op at 8; DOL Br at 29 ["To be sure, even during their sleep and meal breaks, employees working twenty-four hour shifts are not truly free from their employment – for example, they are generally not free to leave their employers' premises, and are expected to respond if called back to work"]).  Unlike residential employees, who reside in their workplace, home health care aides report for a 24-hour shift, often remaining available from beginning to end.  Given the nature of a home health care aide's work—providing 24-hour patient care without meaningful breaks—the Wage Order sensibly excludes them from the "residential employee" exception and its corresponding compensation deductions.  In the context of "sleeping hours," the Wage Order recognizes

that home health aides remain on call (i.e., "available for work") even during those hours designated for sleep.[1]

Under the plain terms of the Wage Order, for non-residential employees like plaintiffs—who remain consistently "available for work," even during sleeping hours—sleep time cannot be deducted from their pay. DOL's contrary reading is expressly belied by the text of the regulation, and therefore warrants no deference (see Visiting Nurse Serv. of New York Home Care v. New York State Dep't of Health, 5 NY3d 499, 506 [2005]; Albano v Bd of Trustees of New York City Fire Dep't, 98 NY2d 548, 553 [2002]; Raritan Dev Corp v Silva, 91 NY2d 98, 100 [1997]).

## III.

Casting aside the plain text of the Wage Order, the majority defers to DOL's incompatible reading. Not only does that holding impose a new and problematic standard for agency deference, it enables DOL to circumvent statutory promulgation procedures in favor of an informal and erratic process replete with inconsistency. Worst of all, DOL's interpretation, now adopted by the majority, will have profound and far-reaching ramifications for a vulnerable and often mistreated workforce.

## A.

Under the guise of deference, the majority adopts a construction of the Wage Order that runs contrary to the regulation's text. Deference is unwarranted, however, where an

---

[1] Whether a home health care aide is in fact called upon to perform services during "sleeping hours" does not determine whether the aide is, in the plain meaning of the term, "available for work."

agency's interpretation is "irrational or unreasonable" (Matter of Howard v Wyman, 28 NY2d 434, 438 [1971]) or, in other words, unsupported by the regulation's plain text (Visiting Nurse Serv, 5 NY3d at 506). While we will defer to "a rational interpretation that [is] not inconsistent with the plain language" (James Square Associates LP v Mullen, 21 NY3d 233, 251 [2013]), we have never elevated deference over clear, unambiguous text.

Rather, as we have repeatedly emphasized, plain language must control over an inconsistent agency interpretation (see Raritan Dev Corp, 91 NY2d at 100 [noting our "long-established rule" that we "decline() to enforce" an agency interpretation that is "contrary to the plain meaning" of the relevant "language"]). We have therefore declined to "embrace a regulatory construction that conflicts with the plain meaning of the promulgated language" (Visiting Nurse Serv, 5 NY3d at 506). Indeed, where "the question is one of pure legal interpretation of statutory terms," we have held that "deference to the [agency] is not required" altogether (Matter of Toys "R" Us v Silva, 89 NY2d 411, 419 [1996]). Because pure interpretation is the "function" of the courts, we have reasoned that there is "little basis to rely on any special competence or expertise of the administrative agency" (Albano v Board of Trustees of New York City Fire Dep't, 98 NY2d 548, 553 [2002]).

According to the majority, however, deference to DOL is warranted because, "having authored the promulgated text and exercised its legislatively delegated authority in interpreting it, the agency is best positioned to accurately describe the intent and construction of its chosen language" (majority op at 16). That is not, and has never been,

a basis for deference at the expense of plain text.[2] The majority's novel standard elevates DOL's construction over the text of the Wage Order, suggesting that deference is warranted simply because DOL itself promulgated the regulation (majority op at 16-17). Of course, *every* agency interpreting its own regulation will satisfy the majority's negligible standard, even if the agency's construction is irrational or defied by the regulation's plain language. Such a toothless standard—deferring to an agency's construction of a regulation solely because the agency wrote it—not only distorts our principles of deference, it abandons the Court's role as the proper authority on matters of textual construction.

## B.

DOL's atextual construction warrants particularly exacting scrutiny in light of the extensive, collaborative process by which wage orders must be created. The Minimum Wage Act establishes detailed procedures, involving research, consultation, public hearings, notice, and input from various stakeholders. The transparency and delicate balancing that typify this process assure "fair and studied consideration" (majority op at 17), and ensure that each wage order furthers the critical policy goals underlying the Minimum Wage Act.

Rather than codify rules through the processes required by statute—mandating public notice, hearings, and comments—DOL opts to promulgate revised wage orders "under the guise of interpreting a regulation" (Christensen v Harris Cty, 529 US 576, 588 [2000]; see also Talk Am, Inc v Michigan Bell Tel Co, 564 US 50, 69 [2011] [Scalia, J.,

---

[2] Nor is that approach condoned by Matter of Peckham v Calogero (12 NY3d 424 [2009]), the authority on which the majority relies (majority op at 16).

concurring] [allowing an agency "to do what it pleases" with an existing regulation "frustrates the notice and predictability purposes of rulemaking, and promotes arbitrary government"]; Axelrod, 66 NY2d at 177 [SAPA was designed to "guarantee that the actions of administrative agencies conform to uniform, sound and equitable standards"]). For instance, in support of its most recent interpretation of the Wage Order, DOL relies heavily on a 2010 opinion letter issued in response to the query of an undisclosed recipient. The opinion letter, signed only by an associate attorney at DOL, inserts a new exception into the Wage Order for "live-in, non-residential employees," permitting employers to compensate them for only 13 hours of each 24-hour shift (majority op at 5-6). Presumably, that opinion letter was never considered by the members of the wage board. It was never reviewed in consultation with affected employers or employees. And it certainly was never the subject of public notice or comment. Yet DOL contends that its opinion letter constitutes an "official statement" embodying the "general policy towards compensable work for 24-hour shift employees" (majority op at 6), irrespective of its consistency with the Wage Order's text. Such informal and unchecked modifications—through opinion letters, agency manuals, and other documents—enable DOL to circumvent statutory safeguards in favor of "interpretations" carrying the force of a duly promulgated regulation. And by issuing interpretations untethered to the Wage Order's text, DOL undermines the collective outcome of a comprehensive, statutorily-mandated process.

The majority predicts "staggering burdens" if DOL were forced to issue a separate regulation (majority op at 26 n 9). But the federal government's scheme—which the majority seeks to emulate (majority op at 24)—has done just that. In lieu of ever-changing

"interpretations," the federal Department of Labor employs detailed, duly promulgated provisions aimed at implementing clear, codified rules (see 20 FR 9963, 9965 [Dec 24, 1955]). For instance, unlike the Wage Order, the relevant federal provisions expressly carve out exceptions for "employee[s] . . . required to be on duty for 24 hours or more" (20 FR at 9965; see also 29 CFR 785.22). For that category of employees, "the employer and employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished" (20 FR at 9965; see also 29 CFR 785.22). And for "[e]mployees residing on employer's premises," any "reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted" (20 FR at 9965; see also 29 CFR 785.23).

If DOL prefers an alternative compensation scheme—so as to dock eleven hours of plaintiffs' pay—it should amend the Wage Order in accordance with statutory procedure. While a "separate regulation" is not required "for *every* circumstance" (majority op at 26 n 8 [emphasis added]), it *is* required for those instances involving dramatic pay cuts that are directly precluded by existing regulations. DOL itself apparently recognizes the importance of the promulgation process in adopting exceptions to minimum wage requirements; DOL saw fit to codify the "residential employee" provision before implementing those pay exclusions. Given the devastating impact of DOL's "interpretation"—imposing substantive changes and substantial pay cuts—compliance with formal promulgation procedures is hardly an unreasonable requirement. Any "burdens" that may result (majority op at 26 n 9) are in place by design: the Minimum

Wage Act requires a comprehensive and transparent process in order to ensure a balanced and fair result for our State's employees.

As this case bluntly demonstrates, agency regulations carry the force of law; they "frequently play a more direct role than statutes in defining the public's legal rights and obligations" (John F Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum L Rev 612, 615 [1996]). DOL's "experience with the particularities of this occupation" might well provide a basis for modifying the existing regulatory regime (majority op at 23). It does not, however, permit DOL to unilaterally impose an entirely new wage order.

## C.

Seeing no issue with DOL's evasion, the majority asserts that deference is further warranted because, "for five decades," DOL has not "vacillated in its position" (majority op at 21). Even if a longstanding, uniform construction could supersede plain text, DOL has not exhibited the consistency or clarity that the majority describes. Rather, DOL has been consistent on one and only one position: nonresidential home health care aides may be paid for fewer hours than their shift requires. The interpretations that DOL has adopted to achieve that result have "vacillated" dramatically.

In a 1972 version of DOL's enforcement manual, investigators were told that, to discount a home health care aide's working hours, a "bona fide, regularly scheduled 'sleeping period'" must be established, and "[t]he employer and the employee [must] agree to exclude" those hours from "working time" (DOL Br at ADD91). The 1972 manual also

stated that, in order to exclude an aide's sleeping period, "[a]dequate sleeping facilities" must be "provided" to the employee (id.). That guidance was relatively short-lived. In a 1988 opinion letter issued by the Supervisor for the Administrative Services Unit, DOL moved to a "rule of thumb" that fixed "13 hours as the normal standard for working time" for home health care aides (DOL Br at ADD134). A bona fide, regularly scheduled sleeping period was no longer required. An agreement between employer and employee was no longer required. And adequate sleeping facilities were no longer required.

DOL shifted yet again in 1995. That year, DOL Counsel's Office issued an opinion letter explicitly distinguishing between "live-in home health aides" and "non-live-in home health aides" (DOL Br at ADD139-140). For "non-live-in home health aides," the opinion letter established that only "time actually afforded for sleeping and eating" may be excluded from pay. The 13-hour "rule of thumb," however, no longer applied. Three years later, in 1998, the Commissioner issued another opinion letter returning to the 1988 rule (DOL Br at ADD148-149). Four years after that, in 2002, DOL Counsel's Office reverted back to the 1972 scheme, requiring an agreed-upon sleeping period and adequate sleeping facilitates (DOL Br at ADD150). Eventually, in opinion letters sent to various recipients in 2009 and 2010, DOL swung back to its "rule of thumb" (DOL Br at ADD153-160).

Far from "consistently interpret[ing] the Wage Order" (majority op at 6), DOL has adopted varying and even conflicting interpretations of the very same text. These so-called "minor variations" (majority op at 22 n 6) have very real effects on plaintiffs' lives: they make the difference between adequate sleeping facilities (or not), an agreed-upon schedule

(or not), and a livable wage (or not). In light of the profound impact on plaintiffs' daily lives, they are certainly entitled to "quibble[]" (majority op at 21 n 6) over these meaningful departures from their governing wage order.

IV.

As the majority notes, home health aides "care for some of the most vulnerable members of our society, doing work essential to the survival of their patients" (majority op at 7). These employees are "predominantly composed of women and recent immigrants" (majority op at 7), and comprise a workforce that is "easily exploited and vulnerable to various forms of wage abuse" (majority op at 8). Plaintiffs allegations in this case are "disturbing" to say the least, and "paint a picture of rampant and unchecked years-long exploitation" (majority op at 28). DOL's interpretation of the Wage Order not only enables this mistreatment of home health care aides, it directly affects their livelihood: with eleven hours of pay deducted from their earnings, home health care aides are paid an hourly rate less than the statewide minimum wage. Rather than hold DOL accountable, the majority defers.

In lieu of relief, the majority instructs plaintiffs to go back and seek class certification—which may ultimately be denied—so they might retroactively recover pay for years-old violations of DOL's sleep and meal rules (majority op at 28-31). It is little consolation to afford plaintiffs merely a chance to win what they have already earned: a day's wages for a day's work.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

For Case No. 11:  Order reversed, with costs, matter remitted to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein and certified question answered in the negative.  Opinion by Judge Rivera.  Chief Judge DiFiore and Judges Stein, Wilson and Feinman concur.  Judge Garcia dissents and votes to affirm in an opinion in which Judge Fahey concurs.

For Case No. 12:  Order, insofar as appealed from, reversed, with costs, matter remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein and certified question answered in the negative.  Opinion by Judge Rivera. Chief Judge DiFiore and Judges Stein, Wilson and Feinman concur.  Judge Garcia dissents and votes to affirm in an opinion in which Judge Fahey concurs.

Decided March 26, 2019